**Frederick C. STACEY, Appellant**

v.

**ALLIED STORES CORPORATION.**

No. 84-5199.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 11, 1985.
Decided July 26, 1985.

---

John W. Karr, Washington, D.C., for appellant.

Guy R. Fairstein, New York City, for appellee. Edward Jasen, Washington, D.C., also entered an appearance, for appellee.

Before TAMM, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge.

This appeal is taken from the District Court's grant of judgment n.o.v. in favor of Allied Stores Corporation, the defendant in an action brought by a terminated employee under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (1982). After carefully examining the entire record in this case, we are constrained to conclude that the exacting standards for granting a losing party's motion to overturn a jury verdict and a conditional motion for a new trial were not satisfied here. We therefore reverse and remand the case for a determination of damages.

The facts giving rise to this litigation are amply set forth in the District Court's thorough opinion, which is reported at 581 F.Supp. 1103 (D.D.C.1984). We will therefore recite only the most pertinent facts necessary to our resolution of this appeal.

Beginning on May 31, 1977, Frederick Stacey was employed by Garfinckel, Brooks Brothers, Miller & Rhodes (GBM), a large Washington, D.C.-based department store chain, as corporate security director. That chain owned and managed more than 200 retail stores. In November 1981, Allied Stores, a large department store chain based in New York, successfully completed a tender offer for GBM's stock, resulting in GBM's merger into a wholly-owned Allied subsidiary. Allied promptly decided to close GBM's headquarters office in Washington and to consolidate the functions previously carried on by that office with those of Allied's corporate staff in Manhattan. As a result of this consolidation, Mr. Stacey remained in the employ of the Allied subsidiary for only a short while; he was finally terminated on May 15, 1982.

GBM's office in Washington was thereafter closed in August 1982.

Prior to his termination, Mr. Stacey expressed to GBM's former vice chairman and chief financial officer (who was at that point in Allied's employ) and to an Allied vice-president in New York his willingness to work in a lesser position within Allied's organization. According to his testimony at trial, Mr. Stacey was willing to take a pay cut in order to remain in an Allied loss prevention-security position. Five specific positions were identified by Mr. Stacey at trial, namely security directorships for individual Allied stores in several cities, for which he deemed himself fully qualified. Visiting Allied's New York headquarters shortly before his termination, Mr. Stacey indicated his interest in remaining with Allied in a loss-prevention capacity; he was told, however, by Allied's vice president "that there was nothing in loss prevention and that he [the Allied vice president] would probe the Allied divisions ... to see if there was an opening...." Trial Transcript at 115–16. Nothing came of this conversation, however, and Mr. Stacey ended his employment with Allied without having been considered for other, lesser posts which were in fact available.

Subsequently, Mr. Stacey brought an action in federal district court, claiming that Allied violated the ADEA by terminating him and by refusing to consider him for the other security positions. The case ultimately went to trial, with the jury returning a verdict on liability in favor of Mr. Stacey, the parties having agreed that the measure of damages would be determined by the court post-verdict. Allied thereafter filed a motion for judgment n.o.v. or, in the alternative, for a new trial. Allied argued that there was no evidence that Mr. Stacey's age was a factor in Allied's decision to terminate him. To the contrary, Allied contended, Mr. Stacey's termination was the direct consequence of Allied's business judgment to close GBM's headquarters office and to transfer the functions of that office to the existing Allied headquarters staff in New York. As to the refusal to consider Mr. Stacey for other positions within the organization, Allied maintained that Mr. Stacey's performance as GBM's corporate security director was unsatisfactory. This view of Mr. Stacey's performance was held by Allied's John P. Murphy, Vice President for Financial and Security Audit, who testified at some length at trial. Allied summarizes this evidence in the following way:

Allied had three occasions in 1981, both before and after the merger, to assess at first hand whether Stacey's performance was sufficient. On each occasion Allied came away with legitimate ground for concern, and recorded the factual basis for such concern in contemporaneous documents. These documents preclude fair-minded jurors from finding this reason for Allied's employment decision a mere pretext for intentional age discrimination.

Allied Brief at 32.

Mr. Stacey resisted Allied's motion, contending that the evidence adduced at trial amply supported the jury's verdict. He pointed to the following evidence: (1) substantial trial testimony that Mr. Stacey was a respected and valued officer at GBM, the management of which had found his performance entirely satisfactory; (2) evidence that Allied personnel had made notations of certain GBM employees' ages on a document and had inquired of certain GBM employees, including Mr. Stacey, about their respective ages; (3) evidence that Mr. Murphy of Allied had frequently referred to Allied's security directors as a "cadre of young chargers" (an allegation that Mr. Murphy flatly denied in his own testimony); and (4) evidence that those GBM staff members, including Mr. Stacey, who were involuntarily terminated by Allied were over 40 years of age and thus within the ADEA's protective reach.

In a comprehensive opinion, the District Court granted Allied's motion for judgment n.o.v. The court correctly observed at the outset the applicable legal standard:

Allied must shoulder a heavy burden to be granted judgment notwithstanding

the verdict. The standard of review is high.... [A] motion for judgment notwithstanding the verdict "should not be granted unless the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men could not disagree on the verdict."

581 F.Supp. at 1105 (quoting *Vander Zee v. Karabatsos,* 589 F.2d 723, 726 (D.C.Cir. 1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979)) (other citations omitted). Rightly acknowledging that the trial judge "should not invade the province of the jury, attempt to assess witness credibility, or weigh the evidence," *id.,* the District Court nonetheless concluded that Allied was entitled to judgment n.o.v. for the following reasons: *first,* that Allied had proved a legitimate, nondiscriminatory business reason for closing GBM's headquarters office and abolishing Mr. Stacey's position; and *second,* that Allied's audits and investigations in 1981 revealed deficiencies and problems in the areas of Mr. Stacey's responsibility at GBM. Carefully reviewing the evidence, the District Court determined that the closure of GBM's office constituted a lawful reason for Mr. Stacey's termination which the plaintiff had not rebutted by proving that the discharge resulted, instead, from intentional discrimination. *Id.* at 1107. In addition, the trial court concluded that substantial evidence had been adduced that "Stacey's performance as [GBM's] security director was inadequate" *id.,* and that Mr. Stacey had not shown that the unflattering audits by Allied of GBM's security procedures and conditions were fabricated, contrived or inaccurate. The District Court emphasized in this respect that the ADEA does not prevent an employer's taking adverse action against a protected senior employee, "if the employer makes a good faith determination that the worker's performance has been unsatisfactory." *Id.*

In addition, the District Court advanced several other reasons warranting judgment n.o.v. (1) The five security positions in Allied's organization for which Mr. Stacey was not considered (and which were filled by younger persons) were all branch store jobs paying considerably less than Mr. Stacey's annual salary; moreover, Mr. Stacey's own testimony with respect to his qualifications for those jobs counted "for very little." The plaintiff had failed entirely, the court concluded, to adduce any evidence as to the selected employees' qualifications, experience or training upon which a meaningful comparison with Mr. Stacey could be made. (2) Citing authorities from the Second Circuit, including *Parcinski v. The Outlet Co.,* 673 F.2d 34 (2d Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 950 (1983), the District Court observed that the ADEA "does not compel an employer to consider or offer an employee other employment." *Id.* at 1108. (3) The trial court concluded that certain testimony and argument placed Allied in a "poor light with the jury" and that the jury had apparently been misled by one witness, Albert Bailey. Mr. Bailey, who had worked for Allied in New York before returning to Florida to work in a banking post, testified on behalf of Mr. Stacey about, among other things, Mr. Murphy's references to his "cadre of young chargers" at Allied. (4) Also with respect to Mr. Bailey, whom Allied disparagingly refers to on this appeal as Mr. Stacey's "star witness," the trial court concluded that the time frame of Mr. Bailey's testimony presented important relevancy problems, inasmuch as Mr. Bailey's contact with Mr. Murphy had ended in July 1979 some considerable time before the GBM acquisition and Mr. Stacey's ensuing termination. This particular testimony was deemed by the District Court to be of considerable importance to the jury:

> Murphy denied using the phrase "cadre of young charge[r]s" attributed to him by Bailey. But in the minds of the jurors, that phrase was undoubtedly of importance, because during their deliberations they requested a reading of the Bailey-Murphy testimony.

*Id.* at 1109. The court went on to note that Mr. Bailey was unable in his testimony to point to any employment decision made by

Mr. Murphy on account of age or even any discussion by Mr. Murphy of an employee's age in connection with an employment decision. (5) Finally, the jury had been permitted, in the court's view, to draw unwarranted and impermissible inferences from the fact that an Allied document contained the names of twenty-two GBM employees with the ages of two of the employees penciled-in opposite their names. This document, the court observed, was dated March 1, 1982, shortly before Mr. Stacey was informed that he was being terminated, when in fact the penciled-in notations were made in July 1982 (some months after Mr. Stacey's departure) and were entered in connection with the final preparations for closing down the GBM corporate office in Washington. The prejudice incurring to Allied was manifest, the court concluded, because the document reflected discussions innocently directed toward providing special retirement benefits to the two senior employees.

Concluding that, even with extreme deference to the jury's findings, the verdict in favor of Mr. Stacey was contrary to all reason and based on speculation and surmise, the District Court held that the jury verdict in this case had to fall. The plaintiff's proof in this case was, the court concluded, "uncertain" and tenuous:

> When viewed in its entirety, plaintiff's proof was insufficient to support a finding of age discrimination. However genuine Mr. Stacey's beliefs were, the Court cannot allow the jury to reach a finding that the ADEA was violated in his case.

*Id.* at 1110.

For the various reasons fully articulated by the District Court, Allied's motion for judgment n.o.v. was granted. At the same time, the court denied Allied's alternative motion for a new trial. In due course, pursuant to Allied's motion for an order amending the judgment, the District Court entered an order granting conditionally Allied's motion for a new trial were this court to reverse the judgment n.o.v. entered in Allied's favor.

As our description of the opinion below indicates, the District Court painstakingly evaluated the entire record in this case and employed the applicable legal standard by recognizing the extraordinary judicial deference owed to jury verdicts in our system of law. We are not to tamper lightly with the considered judgment of those drawn together at one point in time to render a judgment that is representative of the good common sense of the American people. It goes without saying that few institutions are as venerable as that of trial by jury, enshrined at the Founding in the Bill of Rights and hallowed by an enormous body of English and American law that commands judges, who are of all officials the least accountable to the people, not to invade the province of judgment by the people.

The District Court was duly mindful of this article of faith of our law; it is therefore not surprising that there is much of the District Court's opinion with which we are in full accord. On this record, we agree that no reasonable jury could have found that Allied's decision to terminate Mr. Stacey was infected with an intent to discriminate against him on grounds of age. For the reasons well stated by the District Court, this record impressively attests to the proposition that Allied was determined, for neutral business reasons, to close entirely GBM's corporate headquarters. That decision rendered Mr. Stacey's corporate-wide management position superfluous; the force of this conclusion is eloquently demonstrated by Mr. Stacey's silence in this litigation as to Allied's closure decision *per se*. Indeed, in his own testimony at trial Mr. Stacey stated that he entertained grave premonitions about the fate of GBM's corporate office in the wake of Allied's successful takeover bid. For, in addition to the uncontradicted evidence of cost-savings and management-consolidation considerations that motivated Allied to close the GBM office, Mr. Stacey himself feared that ill will lingering from GBM's initial hostility to Allied's takeover bid bode ill for the future of GBM's corporate staff.

We thus find ourselves in full agreement with the District Court that the admittedly exacting standards for granting judgment n.o.v. were satisfied with respect to Mr. Stacey's attack on his termination as corporate security director. It is, however, on the second branch of Mr. Stacey's ADEA challenge that we are unable to agree with the disposition below. For while a reasonable jury, on this evidence, quite clearly could have ruled in favor of Allied on the refusal-to-hire prong of Mr. Stacey's attack, we nonetheless conclude that a jury, with the evidence of record before it, could reasonably have found that the justification proffered at trial by Allied—namely, Mr. Stacey's allegedly poor performance at GBM—was pretextual.

Before setting forth our reasons for this conclusion, we pause to observe that this circuit has adopted the same allocation of burden of proof in ADEA cases as in Title VII racial discrimination cases; that is, once a plaintiff presents a *prima facie* case of age discrimination, the defendant has the burden of coming forward with a valid, nondiscriminatory reason for its hiring decision. *See Johnson v. Lehman,* 679 F.2d 918, 921–22 (D.C.Cir.1982) (adopting the rule of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). Mr. Stacey presented a *prima facie* case, and thus the burden shifted to Allied to come forward with a legitimate, nondiscriminatory reason for refusing to hire Mr. Stacey. It was at this legal juncture that the jury could have refused to credit the defense that Allied chose to mount, namely that Mr. Stacey's performance was not up to par to warrant his being considered for a lesser responsibility in a single store.

*First,* there was substantial, uncontradicted testimony that Mr. Stacey was a highly respected corporate manager within GBM, whose senior management had recognized his considerable accomplishments. Not only was there not a single note of disaffection sounded within GBM as to Mr. Stacey's performance, but there was, to the contrary, evident in the testimony a widely-shared perception within GBM management that Mr. Stacey had carried on splendidly for the firm. For example, the jury heard testimony that GBM's president had lauded Mr. Stacey's work, including singling him out for praise to GBM's board of directors, and that a noted improvement in GBM's inventory loss statistics had been brought about since Mr. Stacey's arrival on the scene. Trial Transcript at 474, 482–83, 485. Indeed, Mr. Stacey's praises had been sung at GBM's highest echelon, as the chairman of the board, Mr. Waters, was complimentary about Mr. Stacey's performance. *Id.* at 485.

*Second,* the attack on Mr. Stacey's performance could reasonably have been perceived by the jury as a latter-day inspiration triggered by the exigencies of fending off this litigation. At trial, the plaintiff's case brought out the fact that Mr. Stacey's allegedly sub-par performance had never been articulated by Allied in the pre-litigation phase, including in Allied's own responses to the District of Columbia Office of Human Rights with respect to the reasons for Mr. Stacey's termination.

*Third,* although documentary evidence was introduced evidencing Allied's dissatisfaction with security and inventory control measures in GBM's divisions, those documents did not purport to identify Mr. Stacey as the specific cause or source for these shortcomings. Instead, the principal evidence adduced by Allied at trial tying the uncontradicted evidence of these specific shortcomings to Mr. Stacey was the testimony of Allied's Mr. Murphy. We pause to focus on this testimony, for of all the testimony about Mr. Stacey's performance, Mr. Murphy stands in this record as his sole accusator. Even the other Allied officers who testified about Mr. Stacey's low standing in the Allied organization cited the unflattering views of Mr. Murphy as the source of Allied management's unfavorable opinion of him. Yet when we examine the trial transcript of Mr. Murphy's testimony, we are left with the inescapable conclusion that a reasonable jury could have chosen to reject his testimony. For one thing, his credibility was potentially drawn in ques-

tion when he flatly denied *ever* having used the phrase, "cadre of young chargers." The contradictory testimony of Mr. Bailey could very well have been credited by the jury, for Mr. Bailey, quite unlike Mr. Murphy, had no direct stake in this litigation at all, safely esconced as he was in the Sunshine State and totally removed from the retail department store industry.

It was the uninvolved Floridian, Mr. Bailey, whose testimony was quite precise, namely that Mr. Murphy "would point to [the map] and he would say that he was proud of his cadre of young charge[r]s out there." Trial Transcript at 437. What is more, according to Mr. Bailey, Mr. Murphy used that phrase on a number of occasions. *Id.* at 449. Now we do not sit to weigh the relative credibility of these witnesses; it is, of course, elementary that credibility determinations are reserved exclusively to the jury, *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983), a principle that the District Court correctly recognized. 581 F.Supp. at 1105. And Mr. Murphy's credibility was put on the line in the heat of trial by his own testimony; if Mr. Murphy were simply not believed by the jury, then Allied's case about Mr. Stacey's poor performance would have had to rest on the documentary evidence of the three unflattering audits. That is most certainly evidence which would support a jury verdict in favor of Allied; but there was also evidence, as we have seen, that Mr. Stacey was highly respected in his own organization and indeed that Mr. Bailey, whom Mr. Murphy had recruited to come to Allied in New York to work under his supervision, had been trained initially at the feet of none other than Mr. Stacey. Finally in this respect, the jury had before it testimony as to Mr. Murphy's harboring personal animosity against Mr. Stacey by virtue of the latter's having made a presentation at an industry gathering remonstrating with the retail industry's officialdom for failing to come to grips with what Mr. Stacey saw as an insidious problem—employee dishonesty and defalcations. Trial Transcript at 529-30. Indeed, according to Mr. Bailey, Mr. Murphy stated on several occasions long before Allied's acquisition of GBM "that he did not care for Mr. Stacey." *Id.* at 530.

To be sure, Allied does not rest entirely on the record at trial to support the legitimacy of its refusing to offer Mr. Stacey another job. Allied maintains that, regardless of the quality of Mr. Stacey's performance, Allied as a matter of law had no obligation to consider Mr. Stacey for other employment within the company. Once Allied determined to eliminate Mr. Stacey's position as part of the consolidation flowing from the GBM-Allied merger, Allied owed, in its view, no affirmative duty to try to place Mr. Stacey in another post in the organization.

We have no quarrel with this general proposition of law. Not only do we not sit, as the Second Circuit put it so well, "to judge the wisdom of a corporation's business decisions," *Parcinski, supra,* 673 F.2d at 37, but we can discern no requirement whatever in the ADEA that an employer seek to place in another position an employee whose age brings him or her under the ADEA's protective shield when that employee is being terminated for nondiscriminatory reasons. Indeed, as in *Parcinski* itself, there might well be legitimate and neutral business reasons why an employer would not want to move a protected senior employee into a considerably lower-paying position which carried with it only a shadow of his or her former responsibilities. At the same time, we recognize that a corporation might by virtue of its own internal policies trigger an obligation to consider for other jobs in the organization those protected senior employees who are for lawful reasons required to relinquish their current posts. *Air Line Pilots Association, Int'l v. Trans World Airlines, Inc.*, 713 F.2d 940 (2d Cir.1983), *aff'd in relevant part sub nom. Trans World Airlines v. Thurston,* —— U.S. ——, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (*"Thurston"*).

But these principles of law are not, upon careful analysis, implicated by this case. For whatever reason, Allied did not ad-

 

vance before the jury a business justification that it would not, for reasons unrelated to Mr. Stacey's performance, consider "demoting" him to a single store security directorship when he had previously had corporate-wide responsibility for security in 200 stores and a direct reporting relationship to the president of the acquired company. Instead, Allied grounded its refusal to consider Mr. Stacey for other, lesser jobs solely on the basis of his allegedly poor performance. Acceptance of that defense, however reasonable it may have been, was simply not the sole conclusion that a reasonable jury could draw from the evidence that this jury had before it.

In sum, we agree that the ADEA does not, save for the *Thurston* situation referred to above, embody a command to employers to consider potential employees for other jobs within the organization when a protected employee is terminated for age-neutral reasons. But where, as here, the sole reason advanced for not considering a protected person for other posts could reasonably be found by the jury, based on the entire evidence before it, to be pretextual, we will not sanction the overturning of the verdict of those charged with rendering judgment in this case. There was, in short, enough evidence to insulate this verdict either from judgment n.o.v. or a motion for a new trial. Based on the evidence before us, we can discern no principled basis for concluding that this verdict was infected by prejudice or premised upon surmise, conjecture or a mere scintilla of evidence.

Nor can we on this record conclude that the District Court acted properly in overriding, without explanation, the jury's verdict by granting the conditional motion for a new trial. There is more than adequate evidence of record to support the verdict here, and in view of that evidence, and our careful examination of the entire trial transcript, we cannot agree that the jury was misled in such a way as to warrant the vitiating of its verdict.

The judgment of the District Court is, for the reasons stated, reversed, and the case is remanded for a determination of the amount of damages, consistent with the parties' stipulation entered during the course of trial.

*It is so ordered.*